Thank you all for your willingness to do your duty and give your time and attention to this matter. I come before you today to orally summarize some points that I wish to emphasize that are somewhat contained in the briefs. But as you judges will quickly surmise, there are so many. Try to keep your voice up just a little. Sure. As you will quickly surmise, there are so many pages potentially to consider in this case, and they've been focused in the briefs. So I want to bring this to your attention. This case at this point is focused on the validity of a memorandum of understanding, whether it was whether it was consensually entered and whether it should properly have been enforced. And in the presence of an open controversy about it, whether a district court could make a decision from documents only. Tell us a few. Give us a paragraph about what the case covers, because we have a lot of young people in the audience. Your Honor, I'm happy to. No, I do. Thank you. Thank you, Your Honor. I thank you for that simple, obvious understanding. The parties in this case are the estate of the late Michael Jackson and a foundation which during his lifetime he formed called Heal the World Foundation, which he showed great admiration for and expressed many wishes to use to apply to help humanity. The last party to the case is a corporation called United Fleet. It has a very minor part to play in this case. The controversy arises about the control of Heal the World Foundation and specifically whether Mr. Jackson turned it over to a woman named Melissa Johnson, who's here with me today. That controversy was never resolved through a trial or evidentiary hearing. Rather, the proceedings included a settlement conference in approximately March of 2011 that did not resolve, followed by a quick flurry of attempted settlements through written documents called a Memorandum of Understanding. The first two versions of the Memorandum of Understanding were passed two or three days before the trial date. The attorney passing them on behalf of Heal the World Foundation was not prepared to go to trial, and he was having discussions with the attorneys for the estate. Counsel? Yes. I'm trying to make sure I have the record straight in this case, so see if you can help me out. There was a motion to enforce the settlement agreement, and at the time that motion was filed, Ms. Johnson filed an affidavit which basically said, although I signed this, I didn't think I was signing a final settlement agreement. I thought I was signing something preliminary. That all occurred in June of 2011. Did you request an evidentiary, or did the appellants, because you weren't in the case at that point, obviously, request an evidentiary hearing on the motion to enforce the settlement? Yes, I'll take you through those steps. Answer that question. Yes. Where can I find that in your record? I find a request on the 60B motion, but I don't find one with respect to the motion to enforce the judgment. I believe I addressed it in the reply brief, which I didn't bring to the podium with me. Okay. If you give me a moment. That's all right. If it's in the reply brief, I'll find it. Yes. But let me now focus on the meat of my question. The declaration that Ms. Johnson filed in June says to the district court, essentially, I didn't think this was a final agreement. The district court says, I reject that, and I enter an order enforcing the judgment. And then in September, there's a 60B motion that says some other things, but with respect to the point I just talked about, pretty much the same thing. It says, once again, I didn't know what I was signing. Why is that an appropriate 60B motion? It's an issue that the judge considered at the time of the motion to enforce, rejected correctly or incorrectly. Why does that become the proper subject of a 60B motion? Your Honor, as you know, I didn't file it, but I will support it. Right. I'm not blaming you. No, no, I got it. I got it. But I want to be very straight in this court of appeals. I defend that motion clearly because of the egregious wrong that occurred before the order was made on June 27th. And my opinion is, is that the district court, by using only documents to make a decision, missed many points. For example, Your Honor, the declaration filed by Ms. Johnson was prepared by her. She's not trained in the law and doesn't have the skills to articulate fine points that can matter a great deal to those of us who have spent years in this process. When an attorney curses at a client on the phone to tell her to be silent, to accept an agreement, that's highly unusual and would need to be emphasized. When an attorney passes two versions of a document without signature pages, both of which say it's tentative, and then at 648 in the evening by e-mail transmits a third version the night before trial and doesn't explain it and doesn't go into detail about the material change in the language in the first paragraph, that's the kind of thing that tells us something wrong is going on. Now, by itself, that may not be the whole story. And we would have to look to some other events. So let me mention a couple of others, please, Your Honor. Number two, when that same attorney is told in writing on May 16th that he's fired and the only thing he's permitted to do is to oppose the motion, the memorandum of understanding, and he is asked in that same writing, which is an exhibit at 210.1-FF, that he is supposed to ask for an evidentiary hearing, and he then files a barrage, my word, barrage, of papers totaling 608 pages following, starting on May 18th, and his 608 pages support the memorandum of understanding, don't oppose it, and include his rendition of his new bill, which he has never shown his client, which has escalated from 70-some-odd thousand, about 78,000, to $613,000, a confidential document never shown to his own client, and attacks the new attorney who has been recently acquired by the Heal the World Foundation as a dog bite specialist. I can only imagine his thinking in doing that. We have to wonder what's going on here, and we have to oppose it. Well, all this was before the trial court. Your Honor, what was before the trial court, yes, Your Honor, you're exactly right. These points, but they weren't well summarized and there was no evidentiary hearing. And without an evidentiary hearing, you're hearing me summarize it. I have many years of experience. You have many years of experience. A trial court looking only at documents and hearing oral arguments at best doesn't have the same texture or feeling for what's going on as when it's well presented. Cross-examining Mr. Pease, who never filed a meaningful opposition to the accusations against him, could bring to light his odd behavior and his betrayal of his client. What's your bottom line? I want an evidentiary hearing in the district court. I believe that a judge, and I have no reason to believe I don't have anything but a sincere judge, will hear the evidence, and when hearing the evidence, might be as shocked as I was. You want an evidentiary hearing. You know, you only have a limited amount of time. I know that, Your Honor. But that's your bottom line and key point. That's my bottom realistic line. My real wish, my bigger wish is you'd overturn this. Yeah, you want to save some time for rebuttal. Thank you, sir. Mr. Brown, before you sit down. You're a pleasure. What? Before you sit down, would you look and just tell me when you get back up on rebuttal where in your reply brief the citation is for where you asked for an evidentiary hearing. I'll come right back. On the motion to enforce the judgment. I think I'll be out of view for just a moment. I think I can find it quickly. Thank you. Sure. You just do it on rebuttal. Thank you. Okay. Thank you. Good morning, Your Honors. Vincent Cifo on behalf of the plaintiffs, the estate of Michael Jackson and Triumph International. Keep your voice up. Keep your voice up. Yes, Your Honor. I apologize. That's good. All right. Let me respond to the evidentiary hearing, which I now understand is Pellan's bottom line. There, as Rule 43 provides, the lower court has broad discretion. I believe, Your Honor, in response to Judge Horowitz's question, that there was no request for an evidentiary hearing on the motion to enforce the settlement. Was there an oral argument on the motion to enforce? Oh, yes, Your Honor. Did she submit it or did she hear argument and then submit it? No, we had argument. The judge provided a tentative decision, asked the parties to meet and confer to prepare a status statement as to basically the question about enforcing the settlement. I don't have the site right in front of me, but it's in the record that status report reflected the parties' differences as to the enforcement of the settlement. And then about two weeks later, I believe, maybe 10 days, the judge then entered her order enforcing the settlement. Let me ask you this. In making her determination, did she make any findings of fact? I believe so, Your Honor. I mean, we can go through it. I mean, she went through each of the factual arguments being made, such as conflicts of interest, things like that. And did she make any credibility determinations? No. There weren't. From our point of view, there was no credibility issues to be resolved. I believe that the question was raised. What was the underlying factual dispute that she had to resolve in order to enforce the settlement? The argument raised by the defendants was that when Ms. Johnson signed the binding settlement, she didn't either realize what the document was, which Judge Gee discusses extensively in her June 2011 order enforcing the settlement, and two, the primary argument was that somehow Mr. Peace, the defendant's lawyer at the time, had deceived the defendant into whether this was a binding settlement. So in granting the motion to enforce, she determined or found that Mr. Peace did not mislead Ms. Johnson? Correct. And there's actually in the record, there is a letter which was submitted by defendants because we otherwise wouldn't have had it. There was a letter from Mr. Peace that was forwarded with one of the draft proposals strongly recommending and explaining the facts why he was recommending the settlement. And actually, this is cited by Judge Gee in Judge Gee's order. So get my point.  The June 27th order can be found at Volume 3, Excerpts of Record, commencing at page 807 through 820. So did Judge Gee find that Ms. Johnson understood or knew that when she signed the third version that that was a final understanding as to the essential terms of the settlement that were binding? Yes. That's Judge Gee's June 27th order as well as the order on the Rule 60 motion. I'm only concerned about the enforcement for a minute. Okay. In the June 27th, 2011 decision, she specifically found that the document that was signed, which was approximately five pages of text, and she found that the first paragraph in the heading in bold recited that this would be a binding agreement whether or not the parties entered into any subsequent long form. And she also noted that the language of the settlement agreement was plain, simply written, easily understood. And it's quite clear. So she implicitly found or she found either explicitly or implicitly that Ms. Johnson read and understood the third version. To be honest, Your Honor, I don't know if she expressly found that Ms. Johnson read it. But I don't think that's necessary because she's presumed to have read it. And if she signs a document she doesn't read, she's presumed to understand what it meant anyway. As I read Ms. Johnson's declaration, what she says is that I know this said binding on it, but my lawyer told me it wouldn't be. That's essentially what she says. I signed it. I knew it said binding on it, but I thought this was just a prelude to further negotiations. That's a fair summary of her declaration, is it not? I think that's fair. Yes, Your Honor. I'm not sure if it's. Judge G. says that's enough for me. You read it and signed it. The fact that you claim that your lawyer gave you bad advice, she says, hey, there's no evidence of that, which I'm not sure is true because there is the affid, the declaration. But I don't think that's enough. So my question is, as a legal matter, let's assume a settlement agreement is entered into binding on its face, a party reads it, but is told by her lawyer that don't worry, this doesn't do anything. Is that a reason to set aside the settlement? No, Your Honor. That may be the basis for the defendants to have a claim against their past attorney. But from the plaintiff's point of view, that is still an enforceable agreement. I don't think the law is that a party can avoid the consequences of entering into agreement, which is plain on its face, because claiming that her own attorney or defendant's own attorney told her that the contract didn't mean what it said. We have no control over what Mr. Peace did or didn't say. Right. And I think reading the record as a whole, other than Mr. Peace, I don't think there's a dispute over whether or not a settlement agreement should be enforced. When there's a dispute over whether or not the parties actually agreed, and you have to make findings that the parties agreed to all the essential terms of the settlement, usually the judge makes some pretty clear findings. I think Judge Fee did here. It's not entirely clear to me that she did. Well, I don't know. I mean, she may have, but usually when you're making credibility determinations that are essential to findings, it's usually done with live testimony, not necessarily. No. I would agree. I think it's a general rule where there is a credibility issue. The defendants say something. The plaintiffs say something different. That may be the case. But to the extent there was a credibility issue here, it was between the defendants and their attorneys, not the plaintiffs. Plaintiffs provided a — yes, Your Honor. But let's — I mean, I understand that. But let's assume that there is a credibility issue between the attorney and the defendant. And the defendant says, my attorney said sign this. It's a letter to the judge asking for a continuance. And she signed it, and it turned out to be a settlement agreement. We wouldn't enforce that, would we? Again, Your Honor, I think as to the other party to the agreement, we are not responsible for what the counsel for the other side tells them. I mean, the fact that the counsel may have given bad advice, motivated by whatever reason, doesn't avoid the effect of a written, clear, signed agreement. If we had said — Do you think there's no meaning to the violence? No. The example I gave you, I admit, was extreme. But I'm trying to figure out where along the line this falls. On the one hand, we don't let somebody say, gee, I signed it and I was told by an attorney to sign it, but now I'm having second thoughts and I don't want to do it. On the other hand, if she really didn't agree to anything and the lawyer just said sign this, don't read it, we're done, I'm not sure that's not something the court ought to look into. Well, let me respond to that. In interpreting contracts, and it's basically contract interpretation which applies to whether or not the settlement has been entered into, we first start with the signed document. And if we look at the signed document, it's clearly a binding agreement. It's signed by both parties. I mean, there's absolutely no question on the face of the document. The law is that if one party to a contract has induced the other party by fraud to enter into it, you might be able to avoid the contract. But that's not our facts. There's no claim, there's no assertion that the plaintiffs somehow defrauded the defendants. The claim is simply that her attorney, for whom we have no responsibility, told her that the contract did not mean what it clearly says on its face. And if a party can avoid that, can avoid a contract by saying I was given bad advice by my own representative, then it seems to me it's going to be very hard to enforce any contract because that claim can be made at virtually any dispute about a contract. What was one of her arguments, one of the arguments that her attorney was pressing her because he was going to get a good-sized fee from the defendant in this case. And part of that was that without letting her know, he was jumping his fee from 300 to 500. Was that part of her argument? Yes. The briefs in this case are all over the place. They're not clearly written as far as I'm concerned. I'm sorry, Your Honor, I did not follow. What? I didn't just follow your comment. It's just the briefs were all over the place. Weren't they oversized? Defendants were, yes. What? The defendants' briefs were oversized. How about yours? No. How many pages did you have? I think it's approximately 70, but the word count was within the rules. That's way oversized. It was within the word count spied by the rules. Yes. They were long. All the briefs were long in this case. I don't disagree. But let me answer Judge Perry's question. But you've got to learn to file clear briefs. It's one of the big problems we have, you know. How thick was the record in this case? You mean the excerpts of the record? Yeah, the excerpts. I'd say it's about this long. Oh, that's wonderful. That long, huh? Okay. Yeah. But I'm not responding. No. Was there some evidence in the record that Ms. Johnson was aware of the increase in attorneys' fees? Yes. Where was that? I believe the record demonstrates that at least by June 20. Tell me where it is in the record. I mean, the record is this big, you know, the excerpts. Didn't the district judge find that in her Rule 60B order? I'm sorry, Your Honor. In her 60B order, the order denying the 60B motion, the judge found that this was not newly discovered evidence because she knew it at the time that the settlement agreement was enforced. I think what Judge Gee found was that the defendants knew that their attorneys had submitted or prepared an increased bill on or about June 20, which was before the entering of the judgment of the order enforcing the settlement on June 27. And Ms. Johnson, the defendants admit that. And if I may, that's in the record, in the excerpts of record, pages 880 through 896. And Ms. Johnson admitted it in her declaration that she knew by June 20 prior to the enforcement of the settlement. So how does that come up? That's after the hearing that you told me that was held on the motion to enforce, correct? Well, yes. It's after the hearing. But there's nothing to prevent the defendants of filing something at the time saying we've just learned. The judge hadn't ruled. The judge hadn't ruled. But the judge does say, I'm looking at her order. She does say that he submitted his first so-called inflated bill to the court on June 1, two weeks before the hearing. Yes, Your Honor. The defendants claim that they didn't get that. I simply, we don't know whether or not Mr. Pease sent them a copy on June 1 or not. They say they didn't get it on June 1, but they admit they got it on June 20. What year? What year? 2011.  And there was also, I believe, on June 16 an e-mail to Ms. Johnson and to her counsel of another bill. But let me make one comment about Mr. Pease's bills, because the entire predicate of defendants' argument is that the plaintiffs agreed that they would directly pay Mr. Pease whatever amount of money he demanded as his legal fees. It is false. That is not the settlement. There's nothing in the record besides some outrageous, inflammatory claims of bribery, asserting that my firm paid Mr. Pease to get his agreement. Nothing could be further from the truth. All the settlement provides, as is not unusual, and as Judge Gee mentioned, not unusual, that one side agrees to pay the reasonable litigation expenses of the other in connection with the settlement. And for all of defendants' arguments about terrible Mr. Pease and his fraudulent billings, in July of 2011, defendants submitted those now-admitted fraudulent billings to the plaintiffs, demanding we reimburse them for over $600,000 of fraudulent billing. We refused to do it. We sent them a long letter analyzing all their claims, totaling $4 million. So how is the fee issue supposed to have been resolved? Well, first of all — Who's going to decide the reasonableness of the fees? Ultimately, if the parties didn't decide, Judge Gee would decide. What would that provide for in the — In the settlement. What is the essential terms of the — That — Where is that provision in this — In this document that says that if the parties can't agree on the reasonableness of Mr. Pease's fees, they will be submitted to the court. What the settlement provides is the Court retains jurisdiction to enforce the settlement. But there's nothing here that says that the fee — Any dispute over the reasonableness of Mr. Pease's fees will be submitted to the court for the court's — Well, I think the statement that the district court retains jurisdiction to enforce the settlement — That — Was there any negotiation between the foundation or the estate and Pease about his fees? None whatsoever. The only comments we ever made regarding Mr. — So when you — so when the — when the estate agreed to pay his fees, you didn't ask for, well, you know, what are we talking about, what's the range we're talking about? Are we talking about $100,000? Are we talking about $50,000? Are we talking — That's correct. $500,000? No. Do you want it? Just that we will pay whatever reasonable fees and — And this is dealt with by — He had worked the case up to — He had worked the case up to go to trial, correct? Correct. Because all this happened on the eve of trial. Correct. So all the pretrial preparation in district court is quite significant. So everybody knew his fees were going to be pretty substantial, correct? I mean, I, in my mind — How much were your fees? Your Honor, I don't think that's appropriate. Well, I mean, but it's pretty substantial, right? Yes. Right. So you knew that Mr. Pease's — Yes, but I'm not sure — We agreed to reimburse the defendants for their reasonable litigation expenses. And then the agreement says reasonable schedules and evidence to be submitted by defendants as to what their expenses were. And that was not an agreement we would — Mr. Pease might have had a little incentive to get Mrs. Johnson to go along, given the amount of potential fees that were involved? Yes, as did the defendants, because if they lost, they owed those fees and would be out of pocket for them. So, but as Judge G points out — They didn't have very much money, did they, the defendants? As far as I know, no, I don't think so. What? I don't believe they did. Well, I mean, I think you get out of the room, you're going to get paid for that, so you know, in the real world he wasn't going to get paid unless he got it from your client. I have no idea what the fee agreement was. I don't know whether Mrs. Johnson was obligated personally on the fee agreement. I don't know whether her personal assets, such as a home, were at risk, and it's not on the record, and I'm not going to speculate. But as Judge Jeef... I'm looking at this document, and to Exhibit E, the declaration of Melissa Johnson in support of motion for relief from judgment, and it's from law offices of fees. It looks like it was e-mailed. And then on it, he lists the e-mails sent October the 29th through 31, total e-mails, and he has 232 telephone calls, 337. And total hours, 316.2, $300 an hour equals $94,860. And then on it, he lists the fee, reduced fee per retainer agreement, initial retainer, he has that, and the $15,000, he got paid $6,930, you know, balance due, $72,900, et cetera. And in it, he explains that — where did I see this? Oh, that the — going to trial, working 10 hours per day at $500 an hour, and the pretrial work is still billed at the reduced rate of $300. And what's the import of that letter? Well, again, Your Honor, all the settlement provides is that the plaintiffs would reimburse for reasonable fees. Well, let me ask you this. Isn't there some place in the record where Ms. Johnson said she wasn't aware of any increase in fees? Yes, but the record — $500. But the record reflects that by no later than June 20th, she had received an inflated billing from Mr. Peace prior to the entry of the order enforcing the judgment. And how much — how much was his — in that document, did it provide or notify her that the fees would be $500 an hour? Yeah. I believe the billing statement reflected a $500-an-hour rate in the — because there were a number of bills that Mr. Peace created. The one that I'm referencing, I think, was slightly over $600,000. And before that, there was a billing at about $500,000-plus, which also was emailed to the defendant on June, I believe, 17th. But again — Judge, I'm sorry. When you're done, let me know. All right. What? I'm sorry, Judge. I didn't realize you were still asking the question, so finish it and I'll ask mine. All right. Thank you. Well, here, I just — I know we're way over a lot of time on this, but I just want to — my question is, whatever Mr. Peace did with Ms. Johnson is really irrelevant. She signed a binding agreement. She may have a lawsuit against him. That's the end of it, right? Well, with the additional fact that the defendants — excuse me, the plaintiffs had nothing to do with Mr. Peace and never agreed to pay any specific amount. It was to be decided later as to what reasonable litigation expenses were. And actually, those expenses — I agree with you. So just to be clear — That's a standard settlement agreement term. Yes. And those didn't — they weren't limited to Mr. Peace. The defendants had — I don't want to extend this. I just want to make sure — that's your position. Your position is, you didn't do anything wrong. She signed the agreement. Even assuming Mr. Peace did something wrong, that gives her a lawsuit against Mr. Peace, but not the ability to invalidate the agreement. Correct. Okay. And you had no — your client had no idea as to what Peace's fees would be. Well, I had — I mean, to be honest, Your Honor, I had an estimate. I knew what Mr. Peace had done. You always want to be honest. Thank you. Continuing to be honest, Your Honor, I had in my mind some range of what I thought Mr. Peace's fees would be, as I also had in my mind a range of what the defendant's prior attorney's fees would be. You didn't say to him, well, just give me a ballpark figure on what you think your client's fees would be. No, no. We did not have that conversation. Why not? Because I had no idea. You just asked him. Well, it didn't seem material at the time, Your Honor, for this. You had a sense of what his fees were going to be because you had — you had expended a number of hours yourself in preparing for trial. Yes. We had a — You didn't do the same thing. You know, trial preparation in the district court is extremely intense and expensive. Your Honor, a fact of which we are aware. No, and we had — as I said, but the issue here is, did — It gets expensive when you start writing 70-page briefs to, you know, that adds to it, you know. I agree. But the question is — Charles Dickens, you're charged by the word. I can testify we did not charge by the word for that long brief. I think we have your argument well in hand. I appreciate the time, Your Honor. It's interesting. And all right, you went. Thank you. You've got a few minutes for rebuttal. Thank you, Your Honor. Very, very short, with appreciation for the thorough questions that have been asked. First of all, Judge Hurwitz, I reviewed my brief, pages 18 through 21. I can find nothing better than dueling declarations as my explanation. Right. Just so that we're clear, what I find in your brief is something that says, well, we never actually asked for an evidentiary hearing, but somebody told Mr. Pease he should. Is that a fair summary of what's in your brief? No. I would go one more step. It's very close, but let me go one more step. The court was shown a declaration by Ms. Johnson which said I instructed my client, my attorney, to do this. And then the court also has before it, I believe it's six documents filed by Mr. Pease, which are wholly, completely inconsistent with the written instruction. The court has the written instruction. I'm just asking a question. You're in front of the judge. You're there. You're having an oral argument. Nobody ever says to the judge in writing or otherwise, we want an evidentiary hearing. Right? I can't say differently. I agree with what you're saying. Okay. So let me then ask you what I think is the sort of central question in this case. Why isn't this a lawsuit? Why isn't your remedy a lawsuit against Mr. Pease as opposed to setting aside a settlement that your client agrees that she signed and agrees that she read? Because when you accumulate a series of facts, you can reasonably come to a conclusion that something far more egregious occurred. In other words, this is not about a lawyer giving advice that the client later regrets. This is not about a client changing his or her mind. This is about an attorney setting out to do something in breach of the attorney's fiduciary duties to the client. The series of conduct simply listed starts with the manner in which the MOU was handled and what the client says about it in her own declaration. It continues to the fact that Mr. Pease knew he was fired two ways. May 13th, a letter was delivered to him. He chose to disregard it, saying, gee, it came from somebody I don't normally get commands from. Then on May 16th, he gets an e-mail telling him, you're not going to act for us anymore unless you oppose the MOU and ask for an evidentiary hearing. That document was in front of the district court. It's before you. It's in Ms. Johnson's declaration. And I believe it's Exhibit FF. In addition, on the 17th, the motion to enforce is filed. And on the 18th, Mr. Pease files five documents. One day later, files five documents seeking to enforce the MOU, arguing with the enforcement motion that the defendant who had entered the MOU had really been in compliance with it. This is in utter, complete contradiction of his instruction in writing on May 16th. It's unequivocal that we can look at. We don't have to turn just to Ms. Johnson's memory. We can see the words. No lawyer acting in good faith as a fiduciary of a client with a straight face can explain that. Why isn't your suit against the lawyer? Because a lawsuit against a lawyer in a context like this isn't very good in terms of justice. And the opportunity to come. Why isn't it very good? Because I have an opportunity to come before three highly experienced judges and take a look at the treachery that was played upon the director of Heal the World Foundation and rectify it here. A lawsuit against a lawyer for malpractice at best can get you a judgment. And if you're lucky enough for that lawyer to have a malpractice insurance carrier, you might get some money. This case isn't about money. This case is about a purpose, a foundation that was inspired by Mr. Jackson himself to do good for humanity. And we have not lost sight of that. How much how much money did the foundation raise? I don't know, Your Honor. It's not all that large amounts. We're not know what it is. I honestly don't know. I did. I will give you from what I've heard in my course of being on hearsay. You just don't have it. I'm not sure. I'm really I would tell you instantly. I know you're never curious enough to find out. It's not that I'm not curious. I know what the problem was here. Your Honor, I have a background in finance and accounting. I think that way. Somewhere I recall that your client's position was that she didn't know or have any idea that when the matter went to trial, the fees would go up. You know, the per hour rate would go up. There was nothing. Is that what her position was? Oh, yeah. There's nothing in the retainer agreement that looks like that. I'm not talking about the retainer agreement. I'm talking about this document that I've been looking at. No. Which he tells which he says, I believe he said to your client. Yeah. When the trial starts. I appreciate that document exists. I also know. You've never seen it before? That document? Yeah. Yes. But the point. You didn't refer to this in your brief. I don't recall, Your Honor. I don't think you do. No, Your Honor, the point is, in fairness, please, there are 30,000 pages of things in this case. Narrowing a brief down, even with the Court's indulgence in allowing me to go over the limited words, was not simple. And to get this thing focused. Yeah, but that's part of your job. I know that. It's part of your job to present as clear a picture as you can. I agree. I agree. Within the framework of our rules. I agree. And you have to think about how you're going to boil it down, how you're going to make your argument, what is essential in all that. I agree. That's why you get paid the big dollars. I smile and agree with you. Yeah. And, you know, we're your customers. Your Honor. We're the victims of your writing. There's no signed retainer agreement. And under California rules of professional conduct, you can enforce a $1,000 fee against the client without a signed retainer agreement or sue in quantum narrow it. What's that got to do with what we're talking about? He never raised his fees legitimately with consent. Within what? He never got consent for increased fees. He never billed my client. He filed it under seal without sending a copy to my client. My goodness. That's not what a lawyer does. What I'm looking at shows that she got a copy. No. Much later. Much later, Your Honor. He filed it June 1st with the court under seal, which is a violation of attorney-client privilege, sending a bill to the court without redactions. And then I mean, that's one. How does he justify sending six over 600 pages of documents in support of the MOU to the court after he's been instructed in writing to oppose the MOU? These are pieces of evidence that required this. This email goes to Howard, Melissa, Henry and Jim. And since my discussion with Howard and Jim talkless, February 1 through 4, 2011, Howard requested some itemization, et cetera. Then he talks about the emails, talks about telephone calls. He talks about a number of hours. And then on the next page, he talks about how it's going to go up to $500 an hour, you know, for the trial. Which is, I think he said, a week away. And on May 16th, he says, I've never had a worse breakdown with a client. I don't ever want to serve you again. And on June. Is that in what I read you? No, Your Honor. That's in the email that my client exchanged with him on May 16th, which is Exhibit FF, to her declaration. And in Exhibit Z. You refer to this piece of paper I've been reading? I honestly don't recall. I don't think you do. Well, Your Honor, I don't challenge you in the slightest. I'm just candid with you. If you look at Z, it's a disk with voicemail messages on it. I'll look. If you listen to number nine, please. You're right, Long Grace. You're way, way over your time. I am. And I've got all these people there. You've been most generous and courteous. Thank you. You're very kind. Thank you. And we'll see you later. Thank you for your time. Thank you.
judges: Pregerson, Paez, Hurwitz